

Priority ____
Send ____
Enter ____
Closed ____
JS-5/JS-6 ____
JS-2/JS-3 ____
Scan Only ____

THIS CONSTITUTES NOTICE OF ENTRY
AS REQUIRED BY FRCP, RULE 77(d).

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

FRANCIS W. ISCHAY,                    )  No. ~~DP~~ CV 04-1696-PJW
                                      )
                Plaintiff,            )
                                      )  MEMORANDUM OPINION AND ORDER
        v.                            )
                                      )
JO ANNE B. BARNHART, Commissioner )
of the Social Security                )
Administration,                       )
                                      )
                Defendant.            )
_____)

I.

INTRODUCTION

Plaintiff brings this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) seeking reversal of the decision by Defendant Social Security Administration ("Agency") denying Supplemental Security Income ("SSI") benefits.  Alternatively, he asks the Court to remand the case to the Agency for further proceedings.  For the reasons discussed below, the Agency's decision is REVERSED and the case is REMANDED for the award of benefits.



II.

BACKGROUND

Plaintiff was born on February 2, 1934, and was 69 years old at the time of the relevant administrative hearing.  (AR 465.)  He is a high-school graduate, with three years of college-level training in engineering and economics.  (AR 51, 465.)  He has past relevant skilled work as a production superintendent for an aluminum distribution company.  (AR 51, 465-66.)

Plaintiff filed protectively for SSI benefits on January 17, 1995.  (AR 464.)  In his application, he alleged disability since April 4, 1994, because of hypertension and low back pain.  (AR 51.)  Plaintiff timely requested a hearing before an administrative law judge ("ALJ") after his claim was denied initially and on reconsideration.  (See AR 50, 107.)

Over the years, various ALJs held four hearings on Plaintiff's application.  Although only the decision that followed the ultimate hearing is at issue in this case, the substance of all four hearings and the evidence introduced at each is relevant because of Plaintiff's assertion of the doctrine of law of the case.  Accordingly, the Court will summarize the four hearings in chronological order.

A.   The First Hearing (October 16, 1996)

The first hearing was held on October 16, 1996.  (AR 70.)  Plaintiff appeared with counsel and testified.  (See AR 72-85.)  The ALJ also heard testimony from Alan Boroskin, a vocational expert.  (See AR 86-95.)

At the first hearing, Plaintiff stated that he finished three years of college course work in engineering and economics.  (See AR 72-73.)  He explained that he had last worked in 1994, overseeing

1  production and quality-control at an aluminum manufacturing plant.
2  (AR 73-74.)  Plaintiff's general duties were supervisory in nature;
3  his specific duties involved walking, retrieving data from a computer,
4  making phone calls, occasional local travel to visit suppliers of raw
5  materials, and hiring and firing. (*See* AR 74-76.)  Beginning in 1993,
6  Plaintiff became responsible for supervising three shifts.  (AR 76-
7  77.)  The stress of these additional duties led him to quit this job
8  in 1994 "[u]nder doctor's recommendations because of elevated blood
9  pressure, hypertension."[1]   (AR 76.)

10     Plaintiff's doctor prescribed medication for his blood pressure
11  and recommended stretching exercises and non-prescription doses of
12  Tylenol as needed for his back. (*See* AR 77-81.)  His daily activities
13  included watering the lawn, cooking, watching television, reading,
14  working on his home computer, and corresponding with family.  (AR 80-
15  82.)  Occasionally, Plaintiff also relaxed at his motor home by the
16  beach.   (AR 81.)

17     Regarding his functional limitations, Plaintiff stated that he
18  had sporadic difficulty walking; on bad days, he used a back brace,
19  support brace, and a cane, although he admitted that "[r]ight now I
20  could probably walk easily enough." (AR 82.)  Plaintiff estimated
21  that he sat at his computer for no more than one hour at a time.  (AR
22  83.)  He added that his ability to bend at the waist was limited and
23  described muscle spasms in his back; again, however, he admitted that
24  "I can go into the grocery store, shop, carry it out and probably do

25

26     [1]  A Worker's Compensation claim that Plaintiff brought against
his employer settled in January 1996 for approximately $12,000.  (AR
27  85.)  The record contains the transcript of the deposition testimony
that Plaintiff had given in December 1994, during the pendency of that
28  Worker's Compensation proceeding.  (*See* AR 11-40.)

1 okay." (*See* AR 83.)  Plaintiff considered his hypertension to be the
2 most significant impediment to his return to work.  (AR 83-84.)

3 The ALJ next heard testimony from Alan Boroskin, the Vocational
4 Expert.  (AR 86.)  According to the Dictionary of Occupational Titles
5 ("DOT"), this expert considered that Plaintiff's previous job was
6 skilled labor performed at the light exertional level.  (AR 86.)  The
7 expert added that, given Plaintiff's particular duties--which involved
8 responsibility for seven departments and supervision of approximately
9 100 employees--the stress level of this job would rate at
10 approximately an 8 on a scale of 1 to 10, with 10 indicating the
11 highest level of stress.  (*See* AR 86.)

12 The vocational expert found that many of Plaintiff's skills were
13 transferable to other, less stressful work.  Specifically, the expert
14 explained that Plaintiff could perform jobs a reader, an automobile
15 locator, or in administrative support--all of which were less
16 stressful than his previous work, and each of which involved a lower
17 general level of skill and existed in significant numbers in the local
18 economy.  (*See* AR 87-90.)  Even if none of Plaintiff's skills was
19 transferable, the expert concluded that he still could perform
20 unskilled jobs existing in large numbers in the national economy,
21 including cleaner--a relatively low-stress job performed at the
22 medium-level of exertion for which 81,000 positions existed in the
23 local economy.  (*See* AR 86-87.)

24 In response to Plaintiff's counsel's hypothetical questions, the
25 vocational expert opined that, even if Plaintiff had a marked or
26 significant limitation in his ability to accept instructions and
27 respond appropriately to criticisms from supervisors, he would not be
28 significantly limited in his ability to perform these other jobs.

4

1  (*See* AR 93.)  The expert conceded, however, that if Plaintiff had a
2  marked limitation in his ability to maintain attention and
3  concentration for longer than two hours at a time, he would be unable
4  to perform any of these other jobs.  (AR 92-93.)

5       On January 24, 1997, after analyzing Plaintiff's claims under the
6  Agency's five-step sequential evaluation process, the ALJ issued the
7  first decision.  (AR 50-60.)  Based on his assessment of the medical
8  record, the ALJ determined that, although Plaintiff's last position
9  was too stressful for him, he remained capable of performing any
10  position he held at his company before becoming responsible for
11  managing three shifts of employees.  (*See* AR 58.)  Accordingly, the
12  ALJ concluded that Plaintiff was not disabled as defined in the Social
13  Security Act (the "Act") at any time through the date of that first
14  decision.  (AR 60.)

15       Plaintiff timely requested review of that first decision.  (AR
16  41.)  The Appeals Council affirmed the decision.  (*See* AR 3-4.)
17  Plaintiff then filed suit in this Court, and, on June 15, 1999,
18  Magistrate Judge Ann I. Jones reversed.  (AR 385-95.)  Primarily, the
19  Court faulted the ALJ's step four conclusion that Plaintiff could
20  return to his previous work, observing that there was no evidence that
21  he ever performed the discrete "jobs" that the ALJ considered him
22  capable of resuming.  (AR 389-91.)  The Court found, instead, that the
23  "evidence supports the conclusion that [P]laintiff would be precluded
24  from performing any of his prior work."  (*See* AR 391.)  Additionally,
25  the Court noted that the ALJ offered inadequate reasons for his
26  dismissal of Plaintiff's subjective pain complaints.  (AR 392-94.)  On
27  remand, therefore, the Court instructed the ALJ "to complete the five-
28  step evaluation."  (*See* AR 394.)  The Court entered summary judgment

1  in favor of Plaintiff, and remanded the matter to the Agency with the
2  usual mandate to conduct "further administrative action consistent
3  with this Memorandum Opinion." (AR 395.)  Pursuant to Magistrate
4  Judge Jones's Order, the Appeals Council vacated the first decision
5  and remanded the matter to a different ALJ for additional proceedings.
6  (*See* AR 382-83.)

7  B.   The Second Hearing (January 12, 2000)

8       On remand, a second administrative hearing was held on January
9  12, 2000, before a different ALJ.  (AR 328.)  Once more, Plaintiff
10 appeared with counsel and testified.  (*See* AR 330-53.)  The ALJ also
11 heard testimony from Randi Hetrick, another vocational expert.  (*See*
12 AR 353-378.)

13      At the second hearing, Plaintiff testified at length about his
14 overall financial situation.  He told the ALJ that, since he left his
15 job, he continued to live with his wife in their home, which they had
16 owned for 30 years.  (AR 336-37.)  Additionally, he admitted that he
17 had been receiving early retirement benefits from the Agency since
18 1996.[2]  (AR 332, 337.)  He also confirmed that he had settled his
19 Worker's Compensation claim for $12,000, and that the lump-sum
20 settlement left him responsible for his own continuing medical care.
21 (AR 343-44, 347.)  Plaintiff further testified that, although he had
22 left his company on disability, his company retirement benefits had
23 vested thereafter; under that pension plan, he had received payments

24

25

26      [2] Plaintiff turned 65 on February 2, 1999; thus, he had reached
27 retirement age by the date of the second hearing.  (*See* AR 298-99.)
   Accordingly, the period at issue spanned the alleged onset date of
28 April 5, 1994 to December 31, 1998.  (AR 299.)

totaling approximately $48,000 over a one-year period, and then no further pension payments thereafter. (*See* AR 346, 352-53.)

Plaintiff recapitulated some of his earlier testimony about his work history for the benefit of the new ALJ. (*See* AR 332-34.) He admitted that the reasons his doctor considered him unable to return to his job in 1994 were the stress level of that job and his hypertension disease, although he added his stress manifested itself in "nightmares and mental problems." (*See* AR 345, 349.) He conceded that he "would rather avoid going to doctors," but claimed that he followed their advice and took his prescribed medication religiously. (AR 344.) Plaintiff explained that he had stopped working on the advice of his doctor in 1994, who was then having difficulty controlling his blood pressure with medication; following Plaintiff's separation from the company, his blood pressure dropped considerably and, by 2000, his hypertension was controlled with medication, although it still fluctuated. (AR 345.) He explained that the only time he stopped taking one of his blood pressure medications was in 1997, when his blood pressure had become dangerously *low*. (*See* AR 351-52.)

Plaintiff also clarified the responsibilities he held throughout his career with his former employer. He explained that he had held only two jobs during the previous 15 years: that of assistant plant manager until 1993, and that of plant manager from 1993 until he left the company in 1994. (*See* AR 336, 347-48.) He estimated that, during one of his usual nine-hour workdays as plant manager--his last position at the company--he spent six hours on his feet, and three hours at his desk retrieving data from his computer. (AR 335.) As assistant plant manager, Plaintiff estimated that he spent six hours

7

1  sitting at his computer, and four hours on his feet.  (AR 335-36.)  On
2  the 1-to-10 scale, Plaintiff stated that, if the stress of his final
3  job as plant manager rated an "8," then the stress he had felt in his
4  previous job as an assistant plant manager rated a "7."  (AR 336.)
5  Plaintiff could not explain what about his new position made his
6  stress level unmanageable after 1993.  (AR 348.)  He explained that
7  his hypertension required him to avoid stressful situations, including
8  social events, interactions with strangers, or conflicts of any kind--
9  some or all of which happened on a daily basis during his previous
10  jobs as assistant plant manager and plant manager.  (AR 343.)

11       Additionally, Plaintiff described his physical limitations and
12  explained how they affected his functional capabilities.  He stated
13  that he helped his wife by vacuuming, cooking, and shopping, and
14  admitted that he could stand, sit, and walk for up to one hour
15  intervals.  (AR 337-38, 341.)  He added that changing positions was
16  "one of the most difficult things" for him because of chronic sciatica
17  and told the ALJ that, since 1994, he occasionally used a cane or a
18  walker when his back pain was intense.  (AR 341.)  He claimed that,
19  when his back was out--which occurred once every three months or so--
20  he would be unable to move at all for a week to 10 days at a time.
21  (AR 342.)  He admitted, however, that his doctor had not ordered an
22  MRI of his spine until 1996 and conceded that, when his back was not
23  bothering him, he could lift up to 20 pounds most of the time.  (AR
24  342, 351.)

25       Finally, Plaintiff explained how his functional limitations
26  affected his daily activities.  Specifically, although Plaintiff
27  enjoyed gardening and fishing, he explained that he had given up
28  gardening altogether by October 1996, and had not gone fishing since

8

1   1997.  (AR 338-39.)  He stated that he continued to read and
2   correspond with relatives by computer, but added that his online
3   trading had become less frequent since the first hearing.  (AR 339-
4   40.)  He added that, although he still attended Catholic church
5   services weekly, his back problems interfered with his participation
6   insofar as he was unable to kneel as much as he had in previous years.
7   (AR 340.)

8        The ALJ next heard testimony from Randi Hetrick, a vocational
9   expert.  (AR 353.)  Ms. Hetrick testified that the nearest analogue in
10  the DOT for the job that Plaintiff held for the longest period of
11  time--that of assistant plant manager, which he had held until 1993--
12  was that of "production superintendent"; she further added that
13  Plaintiff's post-1993 duties as plant manager appeared to be covered
14  by the DOT's category of "branch manager."  (AR 354-56.)  This expert
15  stated that both were management jobs and that both involved a
16  specific vocational preparation ("SVP") rating of 8 on a scale of 1 to
17  8, with 8 being the highest level of skill.  (See AR 357-58.)  Ms.
18  Hetrick noted, however, that the duties of a branch manager would
19  include all the duties of a production superintendent, plus additional
20  duties, and that Plaintiff's post-1993 work would be classified as
21  between light and sedentary, and that his pre-1993 job would be light
22  work under the DOT.  (See AR 355-60.)

23       She also explained that Plaintiff had acquired transferrable
24  skills as a result of his experience.  Generally, Ms. Hetrick
25  testified that both of Plaintiff's positions with his former company
26  involved transferrable skills in understanding budgets, monitoring
27  product standards, scheduling, and staffing.  (See AR 360-61.)  More
28  specifically, she opined that Plaintiff's skills were transferrable to

1  the position of warehouse supervisor (a light-duty position with an
2  SVP of 7), and to customer technical services manager, a sedentary
3  position with an SVP of 8.  (AR 362.)  She explained that, although
4  there had been a "flattening out" in demand for production skills in
5  Plaintiff's industry over the past few years, the demand for warehouse
6  skills remained strong overall, particularly in other industries.
7  (See AR 363-67.)

8       The ALJ then asked the expert "to assume an individual 60 years
9  of age, which is a person closely approaching retirement age."  (AR
10 368.)  Additionally, the ALJ stated:

11      I'd like for you to assume that [. . .] the individual's
12      exertional limitations would permit the individual to
13      perform a full range of medium work.  I would like for you
14      to assume an individual with a 12th grade formal education
15      and three years of college, no special degrees conferred.
16      Past relevant work being skilled at the light and/or
17      sedentary level.

18 (AR 368.)  These assumptions would supply the groundwork for several
19 specific hypothetical questions the ALJ intended to ask the vocational
20 expert.

21      Having lain this foundation, the ALJ then posited the first of
22 three hypothetical questions.  Specifically, the ALJ asked:

23      I'd like for you to assume the individual is functionally
24      impaired as a result of hypertension medically controlled
25      and let's say susceptibility to stress.  And the degree of
26      stress will have to be posed separately.  For the purpose of
27      the first hypothetical let's assume that the hypertension is
28      medically-controlled and, therefore, non-severe.  [. . . .]

10

1    [¶]   And let's assume that the stress is not medically
2          controlled but is beneath the moderate level.  Let's say it
3          is severe but, and by severe it means it's effective but
4          it's not moderate, it's mild, manageable.
5    (*See* AR 368-69.)  Under the assumptions posited in this first
6    hypothetical question, the expert opined that this person would be
7    able to perform either of Plaintiff's past relevant jobs.  (AR 369.)
8          The ALJ then refined his assumptions and posited a second
9    hypothetical question to the expert.  Specifically:
10         Now let's assume the same vocational profile and let's
11         assume also that the hypertension is medically controlled
12         and, therefore, non-severe and non-contributory.  Let's
13         assume that the stress is not medically controlled but the
14         effect is moderate, which means it would severely affect the
15         ability to perform the job.  But it would not preclude the
16         performance of the job, the individual could perform the job
17         except that he would be laboring under some degree of
18         impairment.  Would an individual with that vocational
19         profile, in your opinion, still be able to perform
20         [Plaintiff's] past relevant work?
21   (AR 370-71.)  On the assumption that this second hypothetical person
22   would still be able to perform all of the requirements of the jobs,
23   the vocational expert again opined that he could return to perform
24   Plaintiff's previous jobs.  (AR 370.)  The vocational expert also
25   considered this second hypothetical person capable of performing "any
26   of the jobs to which the individual has transferable skills,"
27   including that of warehouse supervisor and customer technical services
28   manager.  (*See* AR 362, 371-72.)  Additionally, the expert stated that

11

1  this second hypothetical person could perform a full range of light to
2  medium unskilled jobs existing in significant numbers in the national
3  economy.[3]  (AR 372.)

4       The ALJ further refined his assumptions in a third hypothetical
5  question to the vocational expert:

6       Now my first hypothetical, let's say if the ability to do
7       the job on a scale of one to five and the mild would be as
8       the two out of a five.  Moderate being the three out of the
9       five.  [. . . .]  [¶].  Now, I'd like to ask the same
10      hypothetical except that the stress would be at a level of
11      four or greater, which means it would be in the market [sic]
12      to extreme, approaching extreme.  [. . . .]  [¶]  And it
13      would hamper the job performance to such a degree that the
14      individual would begin to experience absenteeism and also
15      exhibit physical manifestations of stress which would, could
16      be appetite loss, weight change, loss of sleep, nightmares,
17      somatic symptoms of pain, itching, etc.  In that case would
18      the individual be able to perform [Plaintiff's] past
19      relevant work?

20  (AR 370-71.)  On the assumption that this level of stress would be
21  "consistent and progressive," the vocational expert opined that the
22  third hypothetical person could not perform either of Plaintiff's
23  previous jobs.[4]  (See AR 371.)

24  _____

25      [3]  Plaintiff's counsel waived the ALJ's next line of questioning,
    which had asked the vocational expert to list the specific unskilled
26  jobs that this second hypothetical person could preform.  (See AR
    373.)

27
    [4]  The ALJ assumed, without asking the vocational expert, that
28  this third hypothetical person could not perform either of the two

1        Plaintiff's attorney then posed a fourth hypothetical question
2   for the vocational expert.  Assuming the same vocational profile that
3   the ALJ had posited, and "further assum[ing] that the person is
4   exertionally limited to the full range of medium work," (AR 373),
5   Plaintiff's counsel asked:

6        I'd like you to further assume that the individual is not
7        capable of being subjected to emotional stress of the strain
8        on the job because of underlying labile hypertension and the
9        results of stress, emotional stress and strain on him.  [. .
10       . .]  [¶]  The particular things that, that might cause
11       stress in this individual that would need to be avoided,
12       socializing and contact on more than a superficial level
13       with, with strangers.  Conflicts with any person, whether it
14       be a stranger, coworker, underling.  [. . . .]  [¶]  [Also,]
15       supervisors.  The individual cannot tolerate those work
16       environments, would an individual with these limitations be
17       able to perform [Plaintiff's] past relevant work?

18  (*See* AR 373-74.)  Because Plaintiff's past relevant work would involve
19  periodic conflicts with supervisors, coworkers, peers, underlings, and
20  customers, the vocational expert opined that this hypothetical person
21  could not perform Plaintiff's previous jobs.  (*See* AR 375.)  For that
22  same reason, the expert stated that both of the transferrable-skills
23  jobs that she had identified earlier in the hearing would be precluded
24  under this hypothetical.  (*See* AR 362, 375.)

25

26

27  ─────────────────────
    jobs to which Plaintiff's skill-set was transferrable.  (*See* AR 362,
28  372.)

13

1    To ascertain how Plaintiff's inability to cope with stress would
2  affect his ability to perform unskilled labor, counsel refined the
3  hypothetical question.  That fifth hypothetical question[5] asked the
4  vocational expert to assume that:

5        [T]he changes in [the] physiology [of the fifth hypothetical
6        person], the changes in his, his psycho dynamic make up over
7        the years has, has made him basically intolerant to stress.
8        Intolerant to, to conflict, that's just the way, just the
9        way he is, okay? [. . . .]  [¶]  And I want you [to assume]
10       for purposes of [this fifth hypothetical question that] the
11       person can tolerate rare episodes of superficial conflict.
12       [. . . .]  [¶]  [He] could not handle direct criticism,
13       conflict over job performance that happens on a regular
14       basis, and could not, certainly could not handle the rigors
15       of high production, assembly, packing, things of that
16       nature.  So we're basically looking for a low stress
17       occupation [in the medium range of exertion].

18 (*See* AR 377.)  Given these assumptions--"that the person can only
19 rarely tolerate superficial conflict with anyone at any time," and
20 excluding jobs with "any kind of production demands" on the logic that
21 such jobs "move[] a person back into the jobs where there's going to
22 be more contact with people"--the expert concluded that this fifth
23 hypothetical person could not perform medium, unskilled jobs.  (*See* AR
24 378.)

25

26       [5]  To emphasize that he was refining the fourth hypothetical
   question, counsel called this fifth question "4A."  (AR 377.)  In an
27 effort to bring some clarity to the barrage of hypothetical questions
   posed at that second hearing, the Court will refer to hypothetical
28 question "4A" as the fifth hypothetical.

                                    14

1        Based on these questions and the medical evidence, Plaintiff's
2 attorney urged the ALJ to conclude that "[Plaintiff] is limited to, at
3 most, light exertion jobs, that he has no transferrable skills and
4 that, therefore, he is incapable of making a vocational transition to
5 that narrow range of work." (*See* AR 379-80.)  The ALJ then adjourned
6 the hearing.  (AR 380.)

7        On July 27, 2000, after analyzing Plaintiff's claims under the
8 Agency's five-step sequential evaluation process, the ALJ issued the
9 second decision.  (AR 298-305.)  Based on his assessment of the
10 medical record, the ALJ accepted Plaintiff's treating physician's
11 conclusion that he was "limited to essentially light exertional work
12 during the period at issue." (AR 300.)  The ALJ determined that
13 Plaintiff was not disabled at step five of the process, finding that
14 Plaintiff could perform either of the two transferrable-skills jobs
15 that the vocational expert had identified (*i.e.*, warehouse supervisor
16 or customer technical services), (*see* AR 362), or could perform a
17 range of light-exertional-level unskilled jobs existing in the
18 national economy.  (AR 303.)  Accordingly, the ALJ concluded that
19 Plaintiff was not disabled as defined in the Act at any time through
20 December 31, 1998.  (AR 303-05.)

21       As before, Plaintiff timely requested review of that second
22 decision.  (*See* AR 570-76.)  The Appeals Council affirmed the
23 decision.  (*See* AR 585-87.)  Once more, Plaintiff filed suit in this
24 Court.  Thereafter, the parties stipulated to a remand for the purpose
25 of "obtain[ing] further vocational expert testimony to assist the ALJ
26 in resolving the issue of vocational adjustment." (AR 577-78.)  The
27 Court accepted the stipulation and "remanded for further proceedings,
28 under the fourth sentence of section 405(g) of the [Act], 42 U.S.C.

1 │ § 405(g)." (*See* AR 580-81.) Accordingly, the Appeals Council once
2 │ again vacated the decision and remanded the matter to the same ALJ who
3 │ had conducted the second hearing. (AR 583-84.)

4 │ C.   The Third Hearing (March 17, 2003)

5 │     Pursuant to the stipulated remand order, a third hearing was held
6 │ before the same ALJ on March 17, 2003. (AR 599.) Once more,
7 │ Plaintiff appeared with counsel and testified. (*See* AR 603-07, 616-
8 │ 17.) The ALJ also heard testimony from Freeman Leeth, a new
9 │ vocational expert. (*See* AR 607-16.)

10 │     Plaintiff clarified his duties at his previous job.
11 │ Specifically, he told the ALJ that he was responsible for filling
12 │ orders for sheeted aluminum and making delivery on those orders to
13 │ customers on short notice. (*See* AR 603-04.) Although his duties
14 │ during his 30-year tenure at the company always involved supervisory
15 │ tasks, in his final job as plant manager he supervised 100 to 125
16 │ employees who worked 24 hours per day over three shifts. (*See* AR 603-
17 │ 04.) Additionally, Plaintiff was responsible for hiring new
18 │ employees, firing existing employees by seniority, and for ensuring
19 │ the safety of his workforce. (AR 606-07.)

20 │     Freeman Leeth, the vocational expert, also testified. (AR 607.)
21 │ Mr. Leeth agreed with the previous vocational expert's conclusion that
22 │ Plaintiff's prior work involved warehouse supervision, a light-duty
23 │ job with a SVP of 7 on the 8-point scale. (AR 608.) The ALJ then
24 │ asked Mr. Freeman:

25 │     Assume an individual 60 years old, approaching retirement,
26 │     with 12th grade plus education and past relevant work,
27 │     skilled. [. . . .] I'd like for you to further assume that
28 │     I find [Plaintiff] is functionally impaired as a result of

16

1 the following - hypertension, which is, during the period in
2 question, is medically controlled, degenerative joint
3 disease of the spine which is mild and has not resulted in a
4 significant level of a decrease in range of motion[,] and a
5 stressful condition brought on by the working environment
6 and such activities as having to meet deadlines and having
7 to fire people who had families, et cetera, and I'd like for
8 you to assume that these stressors were the regular
9 stressors that would normally be encountered by a supervisor
10 or manager in a supervisory position and I would like for
11 you to assume that the functional limitations caused by
12 these functional impairments were mild or less than severe
13 and that, as a result of the limitations, the individual was
14 limited to light exertional activities and no other
15 vocational functional limitations.  In your opinion, would
16 an individual with that vocational profile be able to
17 perform the job of a warehouse supervisor or manager as it
18 was performed by [Plaintiff]?
19 (AR 608-09.)  In response to the vocational expert's request for
20 clarification, the ALJ explained the hypothetical question as follows:
21 All three [of Plaintiff's limitations], in combination,
22 result in a severe functional impairment but any one of the
23 three, taken by itself, would not be severe.  However,
24 considering all three in combination and considering that
25 they together meet the threshold requirement of being
26 severe, and, therefore, would not be a step two decision but
27 would take us to step four, which is considering whether or
28 not the individual could perform the past relevant work of

17

1   the job which requires the testimony of a vocational expert
2   to give us an expert opinion as to whether or not the three
3   limitations, in conjunction, together, would result in a
4   condition that would be functionally limiting to such an
5   extent that the individual would not be able to perform the
6   job duties of the past relevant work of [Plaintiff]?
7 (AR 611.)  The vocational expert opined that this hypothetical person
8 could not perform Plaintiff's past relevant work.  (*See* AR 610-11.)
9      Counsel then questioned the vocational expert.  Despite counsel's
10 argument that Plaintiff is "presumptively not able to perform
11 unskilled work," the expert opined that the person described in the
12 ALJ's hypothetical could, indeed, perform some unskilled jobs.  (*See*
13 AR 611-12.)  Counsel surprised the ALJ by abruptly abandoning this
14 line of questioning, but explained why he had done so:
15      The vocational expert has stated that the only type of job
16      that [Plaintiff] could perform would be some type of
17      unskilled work but the, I believe the Commissioner has
18      presumptively concluded at step five, that where an
19      individual such as [Plaintiff] at the same age, education
20      and exertional level, has only the unskilled occupations
21      available to him or occupations that require no
22      transferrable -- or where an individual has no transferrable
23      skills, [Plaintiff] is presumptively considered disabled
24      under the rules and under the [Act], notwithstanding Mr.
25      Leeth's expert opinion.
26 (AR 612.)  Nevertheless, counsel posed another hypothetical question
27 to the expert:
28

18

1      [A]ssume an individual was limited, as the [ALJ] has stated,

2      to light work, who is 60 years old with a 12th grade

3      education who has the impairments as described by the [ALJ],

4      the combination of hypertension, degenerative joint disease,

5      which is mild, and a stress limitation.  Now, the stress

6      limitation is preclusion from any stress that's more than

7      slight and to provide you a definition of that, I would

8      simply say that it's -- that anything more than slight would

9      mean that it would severely affect the ability to perform

10      the job.[6]

11 (AR 614-15.)  The expert opined that no unskilled jobs would be

12 available for this hypothetical person.  (AR 615.)

13     On the basis of this testimony, Plaintiff's counsel argued that

14 he was disabled from the date of onset to his 65th birthday.  (AR

15 615.)  The ALJ then adjourned the hearing.  (AR 617-18.)

16 D.   The Supplemental (Fourth) Hearing (November 13, 2003)

17     The ALJ conducted a supplemental, or fourth, hearing on

18 Plaintiff's application on November 13, 2003.  (AR 619-51.)  The ALJ

19 explained that the supplemental hearing was "strictly for the purpose

20 of vocational expert testimony."  (AR 621.)  For the supplemental

21 hearing, the ALJ did not re-call vocational expert Freeman Leeth;

22 instead, he called Steven Berry, a new vocational expert.  (AR 619-

23 21.)  Counsel for Plaintiff objected, and the following colloquy

24 occurred:

25         ALJ: [. . . .]  State your objection.

26 ────────────────────────

27     [6] Counsel added that his definition of the stress limitation
tracked the definition that the ALJ had adopted at the second hearing.
28 (*Compare* AR 369-70 *with* 614-15.)

1  ATTY: As your Honor knows, this matter is before you on
2  a District Court remand.  We did have that hearing pursuant
3  to district court remand back in March [2003], where the
4  vocational expert, Mr. Leeth, did testify and testified
5  based on his knowledge of [Plaintiff's] past relevant work,
6  that based on the limitations that [Plaintiff] suffers from,
7  he's unable to return to that work and also doesn't possess
8  any transferrable skills to any other work industry.  [. . .
9  .]  [¶]  I don't know why we're here today, your Honor, and
10  I'd like — and I've written your Honor asking him why we're
11  here today and I have no idea and [Plaintiff] has no idea
12  and he'd like to know.

13  ALJ: Well, he's here because I have called a hearing
14  and because I'm going to take testimony from a [vocational
15  expert].  That's why you're here.

16  ATTY: Well, we took the testimony of Freeman Leeth.
17  There was no objection to Mr. Leeth's testimony, neither I
18  nor yourself and he's your own expert.  So it was — I mean,
19  if there was a problem with Mr. Leeth's testimony, why isn't
20  Mr. Leeth here to address those difficulties or problems?  I
21  mean, we just can't ignore Mr. Leeth's testimony.

22  (See AR 622-23.)  The ALJ did not then explain his reasons for the
23  fourth hearing, but simply stated: "Your objection is overruled."  (AR
24  623.)  At the conclusion of the administrative hearing, however, the
25  ALJ chastised counsel for making the objection, stating:

26  Counsel, let me say this.  You do your client a disservice
27  by presuming to tell the [ALJ] how many witnesses to call
28  and to lecture the court on how to conduct a hearing.  If

20

1       you don't know why you're here, you give your client little
2       confidence in your abilities, as an advocate.  I expect more
3       than that from a licensed Member of the Bar.
4  (AR 650.)

5       The vocational expert then began by questioning Plaintiff
6  directly about his employment history.  For the benefit of the new
7  expert, Plaintiff recapitulated much of the employment history he had
8  attested to at the prior hearings.  (*See* AR 624-30.)  The expert
9  stated that the most appropriate DOT category for Plaintiff's prior
10  work was that of production superintendent, a job performed at the
11  light level of exertion with an SVP of 8 on the eight-point scale.
12  (AR 631.)  Mr. Berry also added that several skills Plaintiff had
13  acquired--including knowledge of the manufacturing process, production
14  requirements, and warehousing and report-writing skills--would be
15  transferrable to other jobs and highly marketable, even outside the
16  industry in which Plaintiff honed them.  (AR 631-32.)

17      More specifically, the vocational expert opined that Plaintiff's
18  skills would transfer to the DOT positions of manager of a
19  distribution warehouse, warehouse supervisor, warehouse traffic
20  supervisor, stock supervisor, and warehouse records clerk, all jobs
21  with an SVP of 5 to 6, each performed at the sedentary or light
22  exertional level, and none of which required an adjustment period
23  longer than one month.  (*See* AR 631-32, 636-39.)  The expert explained
24  that these positions existed in significant numbers in the local
25  economy, including 400 to 500 positions for manager of a distribution
26  warehouse, 2400 positions for warehouse supervisor, fewer than 300
27
28

1  jobs for warehouse traffic supervisor, an estimated 1000 positions for
2  stock supervisor, and approximately 700 jobs for warehouse records
3  clerk.  (AR 632-34.)

4       The ALJ then posed several hypothetical questions to this
5  vocational expert.  The first hypothetical question was:

6       Assume that I would find [Plaintiff] able to perform a full
7       range of light work.  Assume an individual 60 years old,
8       which is a person closely approaching retirement age.
9       Assume the individual has a 12th grade formal education,
10      past relevant work has been skilled with transferrable
11      skills at the light exertional level.  [. . . .]  Assume
12      further that the individual is functionally impaired as a
13      result of the following diagnoses -- hypertension,
14      degenerative joint disease, and stress.  Assume that the
15      stress is caused by meeting deadlines, having to fire
16      people, all the other duties that are inherent in making
17      management decisions.  Assume that the hypertension is
18      medically controlled and that the degenerative joint disease
19      is mild, with no significant functional limitation.  Based
20      on that hypothetical, given those exertional and
21      nonexertional impairments and the degree of functional
22      limitations, in your opinion, would that individual be able
23      to perform [Plaintiff's] past relevant work?
24 (AR 634.)  The expert opined that this first hypothetical person could
25 perform Plaintiff's past work.  (AR 635.)

26      The ALJ then posited a second hypothetical question, as follows:
27      Let's assume the same vocational profile, the same
28      functional limitations, degree of impairment.  Let's assume

22

> further that the individual would not be able to perform the
> past relevant work of [Plaintiff], but considering the
> skills that [Plaintiff] has and the jobs to which he has
> transferrable skills [. . . .]

(AR 635.)  The vocational expert opined that this hypothetical person
should be able to perform the jobs of warehouse supervisor, stock
supervisor, manager of a distribution warehouse, warehouse traffic
supervisor, and warehouse records clerk.  (AR 635.)  The expert
admitted that he had not performed an on-site job analysis for these
positions in preparation for Plaintiff's hearing, although he stated
that he had conducted that analysis before testifying in other
matters.  (AR 645-46.)

Plaintiff's attorney then posed a hypothetical question of his
own to the expert.

> [Assume an] individual is limited to the light range of work
> exertionally, as we all understand the definition, 20 pounds
> occasionally, 10 pounds frequently, sitting, walking or
> standing or -- or standing, walking, and sitting for six
> hours out of an eight hour workday, but they suffer from a
> stress condition which is moderate, which I'll define as
> severely affecting the ability to perform the job.  It
> doesn't preclude the ability to perform the job but I'll
> quantify it for you.  By severe, I mean up to, from one-
> third to two-thirds of the workday.  Okay.  They suffer from
> stress.  Okay.  Or they suffer from a condition, which if
> stress is entered into it, they'll experience it.  Okay.
> Now could that individual perform the past relevant work?

(AR 646-47.)

23

1        The expert opined that this person could not perform Plaintiff's
2   past relevant work or any of the five other jobs he had identified,
3   even if his stress severely affected his ability to perform his job
4   for only one-third of the workday.  (*See* AR 647-48.)  When counsel
5   modified his hypothetical to posit a person who could tolerate "more
6   than [a] slight amount of stress," quantified as "no more than 10
7   percent of the workday," the expert still concluded that this person
8   could neither perform Plaintiff's past relevant work nor any of the
9   five other transferrable-skill jobs he had identified.  (*See* AR 648-
10  49.)

11       On January 9, 2004, after analyzing Plaintiff's claims under the
12  Agency's five-step sequential evaluation process, the ALJ issued a
13  third decision.  (AR 464-47.)  At the outset, the ALJ explained that
14  he had ordered testimony from a new vocational expert at the fourth
15  hearing because he considered Freeman Leeth's testimony at the third
16  hearing to be "deficient and illogical."  (AR 465.)  The ALJ then
17  explained why the testimony of expert Steven Berry at the fourth
18  hearing was superior to that previously given by Mr. Leeth:

19       Stephen [*sic*] Berry, another vocational expert[,] was called
20       to testify.  Unlike Mr. Leeth, Mr. Berry has the latest
21       Department of Labor statistics and a laptop computer with
22       the D.O.T. downloaded as software.  Mr. Berry, like Ms.
23       Randi Hetrick at the first hearing in January 2000, was able
24       to identify the D.O.T. code for [Plaintiff's] past work.
25       Mr. Berry's testimony was more persuasive and probative than
26       that obtained from Mr. Leeth, and is thus adopted herein.
27  (AR 465.)

28

24

1   Otherwise, the ALJ incorporated the evaluation of the evidence in
2   the first and second decisions, "but not the findings or conclusion[s]
3   obtained therefrom."   (AR 466.)

4   At step one, the ALJ found "no indication that [Plaintiff]
5   engaged in substantial gainful activity during the period at issue."
6   (AR 466.)   Proceeding to step two, the ALJ found that Plaintiff's
7   hypertension, stress, and degenerative disc disease were all "severe"
8   within the meaning of the regulations.   (AR 467.)   At step three,
9   however, the ALJ found that Plaintiff's combined impairments were not
10  severe enough to meet or medically equal a Listing.   (*See* AR 467.)
11  The ALJ found Plaintiff not disabled at step four, stating "[t]he
12  vocational expert testified that an individual with the above-stated
13  functional limitations would not be precluded from performing the work
14  of a production superintendent."   (AR 466.)   Having concluded that Mr.
15  Berry's testimony established that Plaintiff's "functional limitations
16  did not preclude him from performing his past work," (AR 467), the ALJ
17  explained that this Court's December 12, 2001 Order instructing him to
18  reach step five was "moot."   (*See* AR 466.)

19  Plaintiff was invited to seek Appeals Council review of the third
20  decision, but did not do so.   (*See* AR 461-63.)   Accordingly, by
21  operation of the regulations, the third decision of the ALJ became the
22  final decision of the Agency.   *See* 20 C.F.R. § 404.984(a).   Plaintiff
23  then filed suit in this Court for a third time.

24                              III.

25                      STANDARD OF REVIEW

26  "Disability" under the applicable statute is defined as the
27  inability to perform any substantial gainful activity because of "any
28  medically determinable physical or mental impairment which can be